AJAX FORGE CO. v. PETTIBONE, MULLIKEN & CO. et al.

(Circuit Court of Appeals, Seventh Circuit. October 6, 1903.)

No. 962.

1. PATENTS—INFRINGEMENT—RAILWAY SWITCH RODS.

The Calvert patent, No. 651,413, for an adjustable switch rod, construed, and, as limited by the prior art and the amendment of the claims in the patent office, *held* not infringed by the device shown in the Strom patent, No. 625,961, conceding priority of invention to Calvert.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

James H. Raymond, for appellant.
William H. Dyrenforth, for appellees.

Before JENKINS and BAKER, Circuit Judges, and BUNN, District Judge.

BAKER, Circuit Judge. Appellant unsuccessfully sought to hold appellees for infringement of letters patent No. 651,413, June 12, 1900, to Calvert, assignor, for improvements in switch rods.

The structure that is exhibited in the drawings and described in the specification belongs to a class of appliances for adjusting the operative length of the tiebar that couples the point rails of a split switch, and consists of the following elements in combination: A rod having an ear thereon extending parallel therewith to form a jaw; a circular opening in the ear; a notch on one side of this opening; a chair or clip rigidly attached to the point rail and formed to fit into the jaw of the rod; a circular opening in the part of the chair that fits into the jaw; a disk that sits in the circular opening in the chair; an eccentric bolt hole through this disk; an extension or flange to this disk, which extension is circular and concentric with the bolt hole through the disk, has a notched periphery, and fits into the circular opening in the ear; a pin to engage any peripheral notch with the notch in the opening in the ear when they are in register; and a pivot bolt to lock the chair in the jaw of the rod, which pivot bolt passes through the bolt hole in the disk and its extension and through a bolt hole in the lower jaw of the rod. The adjustment of the point rails of the switch is accomplished by setting the eccentric bolt hole of the disk towards or from the center of the track and locking the parts in place with the pin and pivot bolt.

Calvert not only thought that he was entitled to protection in the specific device, but evidently believed that he was the first to invent any form of adjustable pivot connection between the rod and the chair, and, of course, the first to employ an eccentric to make the pivot connection adjustable; for he stated in the specification:

First. "My invention, broadly stated, consists of an adjustable pivot connection between the switch rod and the chairs, brackets, or other devices secured to the switch rail and connecting the rod therewith. * * * In effect, the constructions which I have herein illustrated and described afford an adjustable or movable pivot connection between the switch rod and the chair, or, more remotely, between the switch rod and the switch rail, which feature I consider the broad idea of my invention, however it may be embodied in detailed construction."

Second. "An obvious modification of this means of locking and adjusting the eccentric, and one so simple as to not require illustration herein, is to have the bolt at the part where it passes through the rod or the ear and the cam polygonal in cross-section, so that the bolt will be in nonrotative engagement with the rod or ear, while the cam will be in nonrotative engagement with the bolt. Such construction would dispense with the extension and also the pin and washer."

Third. "It is also obvious that the extension may be formed upon a common axis with the eccentric and any suitable means provided for preventing rotation of the eccentric about the axis of the pivot bolt, such, for instance, as by the engagement therewith or with the extension thereon of a suitable device upon the chair."

On his application, which was filed April 5, 1899, Calvert based nine claims, as follows:

"(1) An adjustable switch rod comprising a reciprocating rod, a chair secured to the switch rail, and an adjustable pivot connection between said rod and chair, substantially as described.

"(2) An adjustable switch rod comprising a reciprocating rod, a chair secured to the switch rail, an adjustable pivot connection between said rod and chair, and means for adjusting said connection and locking the same in any adjusted position, substantially as described.

"(3) An adjustable switch rod comprising a reciprocating rod, a chair

secured to the switch rail, and an adjustable eccentric or cam interposed between and connecting said rod and chair, substantially as described.

"(4) An adjustable switch rod comprising a reciprocating rod, a chair secured to the switch rail, an adjustable eccentric or cam interposed between and connecting said rod and chair, and means for adjusting said eccentric or cam and locking the same in any adjusted position, substantially as described.

"(5) An adjustable switch rod comprising a reciprocating rod, a chair pivoted thereto and rigidly secured to the switch rail, and an adjustable eccentric or cam interposed between said rod and chair for adjusting the relative positions of said rod and chair, substantially as described. .

"(6) An adjustable switch rod comprising a reciprocating rod, a chair pivoted thereto and secured to the switch rail, an adjustable eccentric or cam interposed between said rod and chair, and means for adjusting said eccentric or cam and locking the same in any adjusted position, substantially as described. .

"(7) An adjustable switch rod comprising a reciprocating rod having an ear thereon extending parallel therewith, a chair fitting in between said ear and rod, a pivot bolt passing through said rod, ear, and chair, an eccentric working in an opening in said ear surrounding said bolt, and means for adjusting said eccentric and locking the same in any adjusted position, substantially as described.

"(8) An adjustable switch rod comprising a reciprocating rod having an ear thereon extending parallel therewith, a chair fitting in between said ear and rod, a pivot bolt passing through said rod, ear, and chair, an eccentric working in an opening in said ear surrounding said bolt, a peripherally notched extension on said eccentric, and means for engaging and locking said extension and eccentric in any adjusted position, substantially as described.

"(9) An adjustable switch rod comprising a reciprocating rod provided with an ear, a pivot bolt passing through said rod and ear, said ear being provided with a circular opening concentric with said bolt and having a notch in one side thereof, of a chair provided with a circular opening therein eccentric to said bolt, an eccentric working in said opening, an extension on said eccentric working in the opening in the ear and provided with peripheral notches and a pin adapted to seat in one of said notches in the extension when the same registers with the notch in the ear, substantially as described."

It will be observed that the first two claims attempt to cover broadly any form of adjustable pivot connection between the rod and the chair, and the third to the sixth, inclusive, any kind of adjustable eccentric. These six claims were manifestly intended to secure the "broad ideas" stated in the above given quotations from the specification. The seventh, eighth, and ninth claims . are progressively closer descriptions of the device disclosed in the drawings and specification; but the seventh and eighth are somewhat inaccurate in defining the eccentric as "working in the opening in the ear," which is the position occupied by the peripherally notched extension. The ninth is more. accurate in describing the eccentric as working in the opening in the chair, and the extension as working in the opening in the ear.

April 22, 1899, the Patent Office rejected all the claims on reference to "patent No. 543,605, Strom, July 30, 1895 (R'ys, Switch Rods), which shows an adjustable switch rod, in view of patent No. 386,888, Lounsbery, July 31, 1888 (Drawbars), which shows the specific form of adjustment of applicant. To substitute the specific form of adjustment of the latter patent for that of the former would not amount to invention."

The Strom patent, No. 543,605, shows a construction in which a chair, formed to fit into the jaw of the rod, is rigidly attached to the switch rail; in the chair is a series of holes in a right line that runs obliquely to the line of the rail; and the switch rails are adjusted by moving the rod along the chair and bolting it at the proper point.

Lounsbery exhibited, for use in connecting a locomotive to its tender, "a drawbar provided with an eccentric so arranged as to render possible the shortening of the connection between the engine and the tender at will." He used a flat plate formed to fit into the jaws of the drawheads. In the plate, where it extends into the jaws, is provided a circular opening. In this opening is seated a disk that has an eccentric bolt hole. The disk has a flange, with a notched periphery, that rests upon the upper surface of the plate. A pin engages any peripheral notch with a notch in the opening when they are in register. When the disk, with its eccentric bolt hole, has been locked in the desired position in the plate, the whole is inserted into the jaw of the drawhead, and the coupling pin is placed in the bolt holes in the jaw and disk.

The examiner, it will be noted, did not cite either of these patents in denial of the novelty of Calvert's combination; but he denied invention to the act of transferring Lounsbery's flanged disk from its plate to the chair of Strom's switch with its adjustable pivot connection. From the examiner's point of view, the references were undoubtedly destructive of Calvert's first six claims; and also the seventh, eighth, and ninth, unless Calvert limited himself to differences in structural details. The position taken by the Patent Office was a clear notification to the applicant that his broad claims would not be allowed, and that the remaining ones were not sufficiently limited to differences, if any, in details of construction.

For nearly a year the applicant remained silent. On April 11, 1900, he addressed this communication to the Patent Office:

"Cancel all of the claims, and substitute instead thereof the following:

"(1) The combination with a switch rail, of an adjustable switch rod comprising a rod having an ear thereon extending parallel therewith to form a jaw, a chair fitting in said jaw and secured to said rail, a pivot bolt passing through said rod and chair, an eccentric working in an opening in said chair and through which the bolt passes, and means for adjusting said eccentric and locking the same in any adjusted position, said eccentric being supported by said ear, substantially as described.

"(2) The combination with a switch rail, of an adjustable switch rod comprising a rod having an ear thereon extending parallel therewith to form a jaw, a chair fitting in said jaw and secured to said rail, a pivot bolt passing through said rod and chair, an eccentric working in an opening in said chair and through which said bolt passes, a peripherally notched extension on said eccentric working in an opening in said ear, and a pin for engaging one of the notches in said extension and locking the same and the eccentric in any adjusted position substantially as described.

"(3) The combination with a switch rail, of an adjustable switch rod comprising a rod provided with an ear to form a jaw, a pivot bolt passing through said rod, said ear being provided with a circular opening therein concentric to said bolt and having a notch on one side thereof, a chair secured to said rail and provided with a circular opening therein, an eccentric working in said opening and through which the pivot bolt passes, an extension on said eccentric working in the ear and provided with peripheral notches and

a pin adapted to seat in one of said notches in the extension when the same registers with the notch in the ear, substantially as described.

"The foregoing claims have now been amended so that they are believed to avoid the references cited.

"The specific form of adjustment of the Lounsbery patent is not the specific form of applicant's. It will be noted that in the Lounsbery patent the bolt passing through the eccentric will be subjected to a shearing strain tending to cut the same in two or wear it at a point between the eccentric and the part to which the bolt is secured. In applicant's construction, however, it will be noted that by reason of the support of the eccentric block in the ear, afforded by the peripherally notched extension, the pivot bolt is practically entirely relieved of the shearing strain, no matter what the adjustment the parts may have. This is of special importance in a switch rod where the bolt is subjected to constant service resulting not so much from the adjustment of the switch rod as from the strain due to passing trains. Furthermore, the combination of the claims as now called for is not found in either of the prior patents."

On June 12, 1900, the patent was issued with the three claims worded as in the above amendment.

Appellees are manufacturing an adjustable switch rod under patent No. 625,961, May 30, 1899, to Strom, assignor. Briefly, the construction consists in placing the Lounsbery flanged disk in a suitable opening in Strom's old chair, with this single exception, that, instead of a movable pin to engage the notched periphery of the flange, Strom employs a stop stud that is permanently secured to the chair. In his application, filed February 11, 1899, nearly two months before Calvert's, Strom, being the inventor of the device of patent No. 543,605, unlike Calvert, did not claim broadly every sort of adjustable pivot connection, but, evidently unaware of Lounsbery's patent, he, like Calvert, thought he was the pioneer in employing an eccentric to make the pivot connection adjustable. On February 20, 1899, the officials of the Patent Office rejected Strom's broad claims for want of invention, as they did Calvert's two months later and on the same references. Strom filed amended claims, in each of which a permanently fixed stop stud was made an essential element; and on this difference in construction the patent was granted.

The record discloses a sharp dispute between Calvert and Strom as to priority of invention, but, assuming that Calvert is senior, we find no infringement.

The only basis for the contention that appellees infringe is found in appellant's reading of claim 1 of the Calvert patent. Appellant admits that the phrase "said eccentric being supported by said ear" describes a material element of the claim, but insists that the condition is fulfilled if the ear affords any support, in any manner, to the eccentric. It will be remembered that the only difference between Lounsbery's construction and Strom's is that Strom used a permanently fixed stop instead of a movable pin to engage the notched flange of the disk. So far as infringement of Calvert's claim 1 is concerned, appellees might as well use Lounsbery's very construction, for Strom and Lounsbery both lock the disk against rotation in its seat in the chair by means of a stop between the chair and the notched flange of the disk, and then, after inserting the chair, disk, flange, and pin between the jaws of the rod, place in position the bolt that

passes through the jaws of the rod and the disk and flange. The disk is supported against lateral movement by the edges of the opening in the chair. The chair, with the disk seated therein, is supported against up and down movement by the jaws of the rod, and is held in place within the jaws by the bolt. So appellant's insistence that the Strom device infringes a claim wherein an essential condition is that the "eccentric (the disk) be supported by the ear (the upper jaw of the rod)" comes to this, that appellant is entitled to the exclusive use of that support which the disk gets from the upper jaw of the rod when the chair, with the disk seated therein, is inserted between the jaws and bolted in place. But it is a necessary condition, in every old and common construction in which a member is held between jaws, that the upper jaw afford support to the inserted member. So does the lower jaw. And, if Calvert had nothing else in mind, he should have omitted the limitation. And that is just what appellant's reading of the claim leads to. When counsel assert that claim 1 is infringed by a combination "of an adjustable switch rod comprising a rod having an ear thereon extending parallel therewith to form a jaw, a chair fitting in the jaw and secured to the rail, a pivot bolt passing through the rod and chair, an eccentric working in an opening in the chair and through which the bolt passes, and means for adjusting the eccentric and locking the same in any adjusted position," they eliminate the condition that the eccentric be supported by the ear; and they do not bring it back into the claim by saying that the support, which the applicant made an essential element of the claim, is that support which unavoidably comes from the presence of the other elements. To be given the quality of an essential element, the support referred to in the claim must be a support that the applicant devised and added to the other elements. Looking alone to the claim, in connection with the specification, we find that the support Calvert had in mind was the support given to the eccentric (the flanged disk) by the insertion of the flange into the opening in the ear.

When the file wrapper and contents are taken into view, the meaning of the limitation is doubly clear. The Patent Office rejected Calvert's broad claims on the ground that there was no invention in putting Lounsbery's eccentric into Strom's chair. Calvert amended and distinguished his device by adding the element of supporting the eccentric by the ear. If he was in good faith, he desired the Patent Office to understand that his support was different from that necessarily afforded the Lounsbery eccentric by the upper jaw of the rod. There is no doubt that the Patent Office so understood his representations. Under these circumstances, appellant will not be heard to assert that the Patent Office erred in rejecting Calvert's broad claims, or that we should give to the claims allowed the meaning of those rejected. Roemer v. Pettie, 132 U. S. 313, 10 Sup. Ct. 98, 33 L. Ed. 382; Phœnix Caster Co. v. Spiegel, 133 U. S. 360, 10 Sup. Ct. 409, 33 L. Ed. 663.

Appellant urges that the support referred to in claim 1 cannot be the support afforded by the insertion of the flange into the opening in the ear, because claim 2 covers the flange "working in an opening

125 F.—48

in the ear," and an interpretation that makes two claims identical is not permissible. If, in order to hold a patentee to his representations to the Patent Office, it were necessary to read two claims as being the same, no court should hesitate to do so. But the presence of the same element in two or more claims does not prove them to be identical. In this case, claim 2 calls for notches on the flange and a pin for engaging one of the notches and locking the eccentric in any desired position. Claim 1 is broader, and calls for any suitable "means for adjusting the eccentric and locking it in position"—provided that the flange (which claim 1 does not require to be notched) fits into an opening in the ear.

The decree is affirmed.